


UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHN D. SIETZ,                                      Case No. 22-cv-

    Plaintiff,

vs.

LEAR CORPORATION,

    Defendant.

_____

GARY T. MIOTKE (P41813)
Attorney for Plaintiff
6828 Park Avenue
Allen Park, MI 48101
(313)-388-4809
gmiotke@miotkelawoffice.com
_____

## COMPLAINT AND DEMAND FOR JURY TRIAL

NOW COMES the Plaintiff, by and through his attorney, and for his Complaint he states that:

### JURISDICTION, PARTIES, VENUE

1. Count I arises out of Plaintiff's employment and is a claim to enforce his rights pursuant to the Americans with Disabilities Act ("ADA"), 42 USC 12101 et seq.

1

2. This Court has jurisdiction over Count I pursuant to 42 USC 12117, 42 USC 2000e-5, and/or 28 USC 1331.

3. This Court has jurisdiction over Count II pursuant to the doctrine of supplemental jurisdiction, 28 USC 1367.

4. In addition, Count I has been properly filed within 90 days of the receipt of the "right to sue letter" by the Plaintiff.

5. Plaintiff is a resident of the City of Livonia, County of Wayne, State of Michigan.

6. Defendant, LEAR CORPORATION is a foreign corporation with substantial contacts to the State of Michigan. In particular, Defendant has offices located in the City of Southfield, County of Oakland, State of Michigan and thus within the Eastern District of Michigan, Southern Division.

7. The events giving rise to this case arose within the Eastern District of Michigan, Southern Division.

## BACKGROUND FACTS

8. Starting on October 19, 1987, Plaintiff was employed by a predecessor entity that the Defendant ultimately purchased. Plaintiff was employed as a Senior Engineer, writing software programs.

9. After the predecessor entity was purchased by the Defendant, Plaintiff started working for the Defendant specifically at its Southfield offices on or around May 4, 1999. He remained so employed until he was terminated on July 22, 2021.

10. Plaintiff performed his duties extremely well and was otherwise an exemplary employee: (a) He always received the highest evaluations from his management. (b) He never received any disciplinary action or negative feedback. (c) He was an extremely committed employee who worked over and above what could be expected, including working on weekends and outside of normal business hours. (d) He very rarely used sick time. (e) He received bonuses that were "over and above" normal bonuses as well as bonuses that were above normal.

11. After the Pandemic set in, Plaintiff sent his direct supervisor Mr. Field and his direct manager Mr. Cremer an email on May 8, 2020. In this email, Plaintiff noted that he was in several high-risk categories related to COVID-19. For this reason, Plaintiff stated that working remotely was his safest option.

12. At the time he wrote this email, Plaintiff was 64 years old, his date of birth being December 11, 1955.

13. Further, Plaintiff had the following impairments and/or conditions: (A) a serious problem with high blood pressure (including investigation and treatment at a hospital) which could be related to Heart Disease; (B) a strong family history of

Heart Disease, including the death of the Plaintiff's father from a heart attack at age 68; (C) having glucose irregularities which could be symptomatic of Diabetes; (D) being a Cancer survivor; and (E) having respiratory problems (i.e. constant coughing for weeks after Plaintiff had flu shots).

14. Taken individually, but especially together, the Plaintiff's impairments and/or conditions noted in the preceding paragraph in combination with his older age and his non-Type O blood type put Plaintiff "at high risk for severe illness from COVID-19".

15. With respect to Plaintiff's May 8, 2020 email, it appears that the Defendant agreed with Plaintiff's assessment that he was in several high-risk categories related to COVID-19. In response to this email, the Defendant permitted Plaintiff to work remotely unlike his colleagues.

16. Specifically, the Defendant had allowed the Plaintiff to work remotely with limited office visits on off-hours in order for the Plaintiff to avoid COVID-19 exposure.

17. In September 2020, the Defendant sent its Southfield campus employees an email stating that "**all employees who are still working remotely, are expected to return to the Southfield campus on a full-time basis on Monday, September 14.**"

18. Yet, this email also specified that one of the two exceptions to returning to work on-site full-time was being "at high risk for severe illness from COVID-19".

19. Plus, this email also specified a process and form that could be used by any employee requiring such a "specific accommodation".

20. Plaintiff completed this "Return to Work Accommodation Request Form" and submitted this form as required by the process specified in the Defendant's email.

21. Plaintiff noted in the form that he was "at high risk for severe illness from COVID-19."

22. Plaintiff also stated in the form that he "would like to work part-time on campus and part-time remotely."

23. As further explanation, Plaintiff also stated in the form: "campus work during typ. off-hrs."

24. In other words, Plaintiff sought to continue to be accommodated as described in paragraph 16 above.

25. After taking *over a month* for the approval process, the Defendant honored this *second* request for accommodation by the Plaintiff. Again, this was due to the high risk to Plaintiff for severe illness from COVID-19.

26. Thereafter, Plaintiff continued to work remotely and only worked on campus during typical off hours until the Defendant terminated his employment on July 22, 2021.

27. As Plaintiff ultimately learned, it appears that this termination decision was eventually made because the Defendant adopted a "3/2" office schedule and thereafter would not honor Plaintiff's request for continued accommodation.

28. That is, after this schedule was announced, E-Systems Human Resources Representative Claudia Corcoran and Plaintiff discussed the possibility of the Plaintiff continuing to be accommodated as described in paragraph 16 above. Ms. Corcoran told Plaintiff that no accommodations were going to be provided to employees.

29. After this conversation with Ms. Corcoran, Plaintiff considered the Defendant's communication announcing the "3/2" office schedule. This communication noted that an employee who was classified full-time remote would not have to abide by the "3/2" office schedule.

30. Thus, Plaintiff sent an email on June 8, 2021 as a follow-up to the discussions about the possibility of the Plaintiff continuing to be accommodated as described in paragraph 16 above. He requested that he be reclassified as full-time

6

remote as a potentially easier way for him to continue to be accommodated as described in paragraph 16 above.

31. Despite these requests, the Defendant said that no accommodations were going to be provided to employees and did not consider the possibility of Plaintiff being granted the requested, continued accommodation (i.e. working remotely and only working on campus during typical off hours) or the alternate accommodation of being classified as full-time remote (which Plaintiff suggested as an easier way to otherwise comply with the "3/2" office schedule communication while continuing to be accommodated as described in paragraph 16 above).

32. Significantly, as a follow-up to these communications, Plaintiff had never been informed that he was absolutely required to abide by the "3/2" office schedule nor was he told that he would either abide by the "3/2" office schedule or he would be fired.

33. Instead, Plaintiff *sort of* learned that this happened on July 22, 2021 after getting a call informing him that he was treated as having quit.

34. This was followed by Ms. Corcoran sending Plaintiff an email disingenuously and inaccurately stating in pertinent part: "As we discussed, since you have not returned to work in the office on the 3/2 work schedule, it is considered a voluntary resignation."

35. In reality, Plaintiff reasonably assumed up until he received Ms. Corcoran's email of July 22, 2021 that the Defendant was still in the process of responding to his request for accommodation and trying to work out some accommodation for him.

36. As noted above, it took the Defendant *over a month* to officially respond to Plaintiff's *second* accommodation request.

37. Plus, Plaintiff never thought that the Defendant would put his life in jeopardy by expecting him to come back to work in-person with *no accommodation whatsoever*.

38. Indeed, Plaintiff's assumption was most reasonable given his interactions with Ms. Corcoran just about two weeks prior to his termination.

39. In this telephone conversation, Ms. Corcoran said that the Defendant would not classify Plaintiff's position as full-time remote.

40. Plaintiff responded that he still needed a safe schedule.

41. To this, Ms. Corcoran replied "we'll call you tomorrow".

42. The next day came and neither Ms. Corcoran nor anyone else from the Defendant called or otherwise communicated with the Plaintiff.

43. Thus, Plaintiff continued to assume that the Defendant was working on Plaintiff's original accommodation request or on *some accommodation* for him.

44. Hence, Plaintiff was completely shocked when he was informed of his purported "voluntary resignation".

45. While the Defendant's mischaracterizations of Plaintiff's termination is grossly inconsistent with reality, the most shocking aspects of the termination decision are the violations of the ADA and/or the PDCRA associated with it.

46. These include, but are not necessarily limited to, the following:

(A) The Defendant's human resources professionals failed to actually participate in the "interactive process" with the Plaintiff and/or terminated it and Plaintiff's employment at the same time, without notice that this would happen.

(B) In part as a corollary to (A), the Defendant appears to believe that its obligations to accommodate employees under the ADA and the PDCRA are trumped by its own policies and changes in its own policies. While the Defendant appears to have recognized its obligations before the adoption of the "3/2" office schedule, it appears that this recognition no longer applied after the adoption of the "3/2" office schedule. Indeed, as evidenced by Ms. Corcoran's statement to the Plaintiff that no accommodations were going to be provided to employees, it appears that the recognition of the Defendant's legal obligations was turned on its head after the adoption of this schedule.

(C) The failure or refusal to grant the Plaintiff's request for accommodation clearly violated the ADA and the PDCRA. No "undue burden" could have been imposed on the Defendant by it having to continue to grant an accommodation that it had been continuously granting for over a year.

## COUNT I: DISABILITY DISCRIMINATION UNDER FEDERAL LAW

47. Plaintiff incorporates paragraphs 1 through 46 above by reference.

48. For all times material to this Complaint, the Defendant was a "covered entity" pursuant to the ADA under 42 USC 12111(2) in that the Defendant was an "employer" under 42 USC 12111(5)(A).

49. By virtue of the impairments and/or conditions described in paragraphs 13 and 14 above, the Plaintiff was a person who was actually and currently disabled for all times material to this Complaint.

50. Specifically, in the context of the Pandemic as it existed at the times material to this Complaint, the Plaintiff's impairments and/or conditions, individually or taken in combination, and together with Plaintiff's older age and non-Type O blood type, put the Plaintiff "at high risk for severe illness from COVID-19" and also affected Plaintiff's major life activities of interacting with others and working.

51. As such, Plaintiff was an individual with a disability under the ADA. More specifically, Plaintiff had one or more physical impairments or conditions that substantially limited one or more of his major life activities and has had a history or record of such an impairment. Further, Plaintiff has been regarded by and/or perceived by the Defendant as having such an impairment.

52. Plaintiff also has been and is a qualified individual with a disability under the ADA. Plaintiff is an individual who, with reasonable accommodation, could perform the essential functions of his job without any undue hardship being caused to the Defendant.

53. Plaintiff was discriminated against by the Defendant in the terms and conditions of his employment in that the Defendant terminated his employment because he had a disability under the ADA. That is, the Defendant terminated the Plaintiff because he had a physical impairment that substantially limits one or more of his major life activities and has had history or record of such an impairment. Further, the Defendant terminated the Plaintiff because it regarded him and/or perceived him as having such an impairment, although its understanding and/or perception of the Plaintiff's impairment may not have been accurate.

54. Further, the Defendant discriminated against the Plaintiff in the terms and conditions of his employment in that it refused to reasonably accommodate his

11

impairments and/or conditions and simply refused to engage in the interactive process to explore how those limitations could have been reasonably accommodated. Instead, it terminated the Plaintiff.

55. The Defendant conducted itself with reckless indifference to the Plaintiff's federally protected rights.

56. As a direct and proximate result, Plaintiff has sustained and will continue to sustain damages including, but not necessarily limited to, the following:

(a) Loss of wages and fringe benefits;

(b) Loss of pension and/or Social Security benefits;

(c) Severe mental anguish and distress;

(d) Embarrassment and humiliation;

(e) Mental anguish stemming from the outrage he experienced as a result of the actions against him;

(f) Fright, shock, and mortification;

(g) Pain and suffering;

(h) Damage to reputation;

(i) Punitive damages; and

(j) Costs and attorney fees.

WHEREFORE, your Plaintiff respectfully requests this Honorable Court to enter a judgment in his favor against the Defendant, awarding him an amount in excess of One Million Two Hundred Thousand ($1,200,000.00) Dollars to which he is entitled for compensatory, exemplary, liquidated, and/or punitive damages; granting him equitable relief as may be necessary; and awarding him costs, interest, and attorney fees so wrongfully incurred.

## COUNT II: DISABILITY DISCRIMINATION UNDER STATE LAW

57. Plaintiff incorporates paragraphs 1 through 56 above by reference.

58. For all times material to this Complaint, the Defendant was an "employer" under The Persons with Disabilities Civil Rights Act ("PDCRA") under MCL 37.1201(b) as well as a "person" under the PDCRA.

59. For the reasons noted above, Plaintiff was a person with a disability under the PDCRA.

60. Plaintiff timely submitted a written request for accommodation under the PDCRA.

61. The Defendant violated the PDCRA by discriminating against the Plaintiff in the ways noted above.

62. As a direct and proximate result, Plaintiff has sustained and will continue to sustain damages including, but not necessarily limited to, the following:

    (a) Loss of wages and fringe benefits;

    (b) Loss of pension and/or Social Security benefits;

    (c) Severe mental anguish and distress;

    (d) Embarrassment and humiliation;

    (e) Mental anguish stemming from the outrage he experienced as a result of the actions against him;

    (f) Fright, shock, and mortification;

    (g) Pain and suffering;

    (h) Damage to reputation;

    (i) Punitive damages; and

    (j) Costs and attorney fees.

WHEREFORE, your Plaintiff respectfully requests this Honorable Court to enter a judgment in his favor against the Defendant, awarding him an amount in excess of One Million Two Hundred Thousand ($1,200,000.00) Dollars to which he is entitled for compensatory, exemplary, liquidated, and/or punitive damages;

granting him equitable relief as may be necessary; and awarding him costs, interest, and attorney fees so wrongfully incurred.

    DEMAND FOR TRIAL BY JURY IS HEREBY MADE.

DATED: December 12, 2022    /s/ GARY T. MIOTKE_____
             GARY T. MIOTKE (P41813)
             Attorney for Plaintiff